UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

LYNN D'AVANZO,                        )
                                      )
            Plaintiff,                )
                                      )
v.                                    )        No.:   3:12-CV-655-TAV-HBG
                                      )
COPPER CELLAR CORPORATION,            )
                                      )
            Defendant.                )

## <u>MEMORANDUM OPINION</u>

This civil case is before the Court on defendant Copper Cellar Corporation's Motion for Summary Judgment [Doc. 29], in which defendant moves for summary judgment on plaintiff Lynn D'Avanzo's employment discrimination claims. Plaintiff responded in opposition to the motion [Doc. 37], to which defendant submitted a reply [Doc. 40]. Both parties have also submitted various deposition excerpts and other exhibits in support of their respective positions. The Court has carefully considered the matter in light of the arguments of the parties as well as the relevant case law and, for the reasons stated herein, the Court will grant defendant's motion.

## I.    Background

Plaintiff's claims arise from her employment with and subsequent termination by defendant. As described herein, plaintiff's amended complaint [Doc. 11] asserts claims against defendant for age, sex, religious, and national origin discrimination, as well as claims related to each protected class for hostile work environment, in violation of the Age Discrimination in Employment Act ("ADEA") and Title VII of the Civil Rights Act

of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.* Plaintiff also alleges retaliation claims in violation of Title VII and the ADEA, as well as asserting various state statutory and common law claims [*Id.* ¶¶ 61-65].

Plaintiff is a female over forty-years of age, of Hungarian and Czechoslovakian descent, and is also a member of the Jewish faith [*Id.* ¶ 5]. After moving to Tennessee from New York in 2004, plaintiff was hired by defendant to work as a server at defendant's Calhoun's restaurant, located in Pigeon Forge, Tennessee, in November 2004 [Doc. 29-1 at 9:20-23]. Mr. Bart Smith ("Mr. Smith"), the general manager for the restaurant, hired plaintiff, and was the individual responsible for hiring, firing, suspending, demoting, or promoting employees [*Id.* at 10-11]. Mr. Smith served in this capacity through plaintiff's employment. Ms. Denise Dixon ("Ms. Dixon") began working at the Pigeon Forge location in 2008 as an assistant manager. Ms. Dixon did not have the authority to hire, fire, promote, or demote employees, and had limited authority to discipline servers or host staff [Doc. 29-5 ¶¶ 13-14]. In addition, defendant employed numerous other host staff, servers, and bartenders at the Pigeon Forge location, the majority of whom were under the age of forty [*Id.* ¶ 11].

During the course of plaintiff's employment with defendant, defendant submitted evidence that plaintiff had a reputation of being a good server who generally provided good service to defendant's customers [Doc. 29-8 at 7:23-8:1; Doc. 29-10 at 10:19-20]. Defendant, however, also submitted evidence showing that plaintiff's co-workers did not always consider her to be a "teamplayer" [Doc. 29-10 at 6:15; Doc. 29-2 at 5:9-18].

2

Various employees testified during discovery that plaintiff did not assist other servers in food delivery, did not perform other duties required of servers beyond serving customers, complained to management when restaurant procedures were not followed, and requested specific sections where she believed she could make more money, complaining when she did not get these sections [Doc. 29-10 at 7:5-9; Doc. 29-2 at 17-18; Doc. 29-8 at 29:13-30:15].  In addition, defendant submitted portions of its Managers' Log, which consists of notes on the relevant restaurant events that occurred on a given evening, where defendant's managers, including but not limited to Ms. Dixon, had noted plaintiff as being upset about the number of tables she received, receiving guest complaints or compliments, or various arguments plaintiff had with servers and host staff, from various times in 2006, 2009, and 2010 [Doc. 29-12].  Plaintiff, in an affidavit submitted in response to defendant's motion, disputes that she was difficult to work with or otherwise failed to get along with her co-workers [Doc. 37-2].

A.    **Plaintiff's Discrimination and Harassment Allegations**

Plaintiff alleges that, beginning in approximately 2008 and continuing through her termination in January 2012, she was subject to discrimination as well as unwelcome harassment because of her age, gender, religion, and national origin, all of which created a hostile work environment.  Although plaintiff's amended complaint [Doc. 11] and response to defendant's summary judgment [Doc. 37-1] allege a large number of ways in which she was discriminated against or otherwise harassed at work, her allegations fall into two general categories: 1) comments made about plaintiff's protected characteristics

3

by co-workers and supervisors; and 2) ways in which plaintiff was treated differently based on the actions of her co-workers and supervisors, the majority of which plaintiff claims was at the hands of Ms. Dixon.

With regard to comments made by co-workers, plaintiff first claims there were several occasions where her Jewish faith was discussed or otherwise commented on by her fellow servers. In approximately 2010, several co-workers asked plaintiff if she wished to go to church with them, and when she responded that she did not attend church because of her Jewish faith, plaintiff recalled that the co-workers, along with Ms. Dixon, began "laughing" and "giggling," and stated that they were surprised that plaintiff was Jewish [Doc. 29-6 at 77:24-25, 81:21-22]. Later, in approximately April 2011, plaintiff claims that Ms. Dixon stated that plaintiff was a "stupid Jew," and that she did not like Jewish people [*Id.* at 84:15]. In addition to these religion-based comments, plaintiff claims she was referred to by Mr. Smith and others as a "Yankee" or "damn Yankee," [*Id.* at 111:14-16] and that, on one occasion at least one co-worker, referring to plaintiff, stated "watch out for her, she's in the [m]afia" [*Id.* at 123:20-124:23], because a character on a television show shared a last name with plaintiff. Plaintiff was also asked to say certain words because they "sounded funny coming out of [plaintiff's] mouth" [*Id.* at 206:23-25]. Plaintiff attributes these comments to her Czechoslovakian and Hungarian background. As for age-based comments, plaintiff claims that one time Mr. Smith told plaintiff to "'[g]et out of my way, old lady" [*Id.* at 159:21-24], although she did not state specifically when this occurred. Other servers, according to plaintiff, referred to her as

an "old lady" sometime in 2011 [*Id.* at 161:5-6], stated that she was "too old for this business" once or twice [Doc. 29-6 at 160:23-25], and Ms. Dixon also once asked plaintiff if she was "too old" for the job [*Id.* at 163:24-25].

Plaintiff also claims that Ms. Dixon, as well as Mr. Smith, treated plaintiff differently from other servers and harassed her because of her age, gender, religion, and national origin. In particular, plaintiff claims on one occasion Ms. Dixon ordered a hostess not to give plaintiff tables to serve, causing her tables to be empty even when the restaurant was crowded, or would make plaintiff wait a long period of time in between tables [Doc. 29-15]. Plaintiff also claims that Ms. Dixon yelled at plaintiff in front of others, told others she disliked plaintiff, and told other employees to stay away from plaintiff. In addition, Ms. Dixon would help younger servers run food out to their tables and clean tables, but not plaintiff [Doc. 37-11 at 208:22-25]. Ms. Dixon would also permit male servers to sit at the bar to watch football, talk on their cellular phones, and commit other violations of company policy, while not permitting plaintiff to do so [*Id.* at 211:10-14]. With respect to Mr. Smith, plaintiff submits that in the summer of 2011, Mr. Smith had asked plaintiff if she would train new servers, and although she had agreed to do so, she later learned that someone else had been chosen to conduct the training [Doc. 29-6 at 177:20-178:3].

## B. Plaintiff's Complaints to Management

As a result of plaintiff's perceived mistreatment by Ms. Dixon, plaintiff submitted a series of written complaints to defendant's management and corporate staff beginning

5

in 2008, coupled with various oral and telephone complaints plaintiff made about Ms. Dixon to Mr. Smith. In an anonymous October 2008 letter, plaintiff writes that Ms. Dixon was "condescending, arrogant, sarcastic and not pleasant to work with" [Doc. 29-13], and that Ms. Dixon would "double check[] every mistake that [plaintiff would] make, making [plaintiff] feel inadequate" [*Id.*]. Similarly, in a September 2009 email to defendant's corporate offices, plaintiff described the "abuse and mistreatment" against her by Ms. Dixon, and stated that Ms. Dixon "scolded female employees for the littlest things, and praised the male servers for incompetence" [Doc. 29-15 at 2-3]. Plaintiff also relayed an incident where a hostess had informed plaintiff that Ms. Dixon had told the hostess not to give plaintiff tables [*Id.* at 2]. In a January 2010 letter to Mr. Smith, plaintiff relayed her opinions that Ms. Dixon was protective of a male server who, in plaintiff's opinion, was "disrespectful, unruly[,] and definitely not a Team Player" [Doc. 29-16 at 3]. Plaintiff sent another similar email to Smith in May 2010 [Doc. 29-17].

After the September 2009 email, Mr. Rick Eldridge ("Mr. Eldridge"), the director for human resources with the company, as well as Mr. Smith, conducted an investigation as to plaintiff's claims of discrimination, which resulted in a written counseling letter to Ms. Dixon on September 24, 2009 [Doc. 29-20]. In the letter, Mr. Smith notes that he had verbally counseled Ms. Dixon about the issue of singling out plaintiff in the past and that the reported behavior "cannot continue" [*Id.*]. This was the only investigation or official discipline Ms. Dixon received during the time period in question.

6

### C. Plaintiff's Termination

On January 7, 2012, while at work, plaintiff was told by several servers that a male server, Mr. Cody Gibson, who had arrived late to work was "stealing tables" from plaintiff, meaning that he was taking tables that were otherwise assigned to her for himself [Doc. 29-6 at 152:11-153:1]. After plaintiff informed Ms. Dixon of what Mr. Gibson was doing, Mr. Gibson later came up to plaintiff and confronted plaintiff about making this accusation [*Id.* at 153:1-18]. Although plaintiff claims that Mr. Gibson was the only one yelling, and that Ms. Dixon subsequently began yelling at plaintiff, Ms. Dixon and another server present stated that both plaintiff and Mr. Gibson were arguing with each other within hearing distance of guests, who complained about the noise [Doc. 29-11 at 16:2-4; Doc. 29-10 at 15:9-11]. Ms. Dixon told both plaintiff and Mr. Gibson separately that if it happened again that evening she would "shut those sections down, they could go home for the evening, and talk to [Mr. Smith] about their jobs on Monday" [Doc. 29-10 at 18:5-9]. Plaintiff then went to the restaurant's bathroom to call Mr. Smith and told him what happened, to which Mr. Smith responded that he would "check into it" [Doc. 29-6 at 155:23].

Later that evening, plaintiff sent a letter to Mr. Eldridge, informing him of the incident and stating that Ms. Dixon had attempted to blame the confrontation on plaintiff [Doc. 29-18 at 3]. Plaintiff also stated that Ms. Dixon had skipped plaintiff in the rotation for tables, and again referenced the 2009 incident where a hostess told plaintiff she had been told by Ms. Dixon not to give plaintiff tables [*Id.*]. After a brief response

7

from Mr. Eldridge stating that he would look into the matter, plaintiff followed up with another email relaying an incident that had occurred a month before where Ms. Dixon had accused plaintiff of standing at the hostess stand during her entire shift and taking a table from another server [Doc. 29-19 at 2].

After these emails, defendant initiated another investigation as to plaintiff's complaints. Mr. Smith spoke with Ms. Dixon and Mr. Gibson, who confirmed that Ms. Dixon had reprimanded both of them and told them to stop arguing in front of customers [Doc. 29-8 at 41:24-42:7]. Ms. Dixon also sent an email to Mr. Eldridge summarizing what happened on January 7, 2012, confirming that she spoke with plaintiff and Mr. Gibson [Doc. 29-22]. Ms. Dixon also claims that at the end of the evening, she overheard plaintiff state to a co-worker that "we New Yorkers just slit peoples [sic] throats" [*Id.*], in response to a question about how she would handle the confrontation with Mr. Gibson and Ms. Dixon, which Ms. Dixon interpreted as an implied threat. After speaking with those involved, reviewing the notations in the Manager's Log, and in light of Mr. Smith's past discussions with plaintiff, Mr. Smith decided to terminate plaintiff because of "[t]he many times of drama, that [defendant] finally had to end" [Doc. 29-8 at 43:2-3]. Plaintiff was terminated on January 10, 2012 [Doc. 1-2].

### D. Plaintiff's EEOC Charge and Complaint

On February 13, 2012, plaintiff submitted a "Statement of Circumstances Leading to Discrimination" to the Equal Employment Opportunity Commission ("EEOC") [Doc. 1-2]. In this document, plaintiff summarizes the letters and emails which she previously

8

sent to defendant in 2010 and 2012, particularly highlighting the manner in which Ms. Dixon treated male employees better or differently than female employees, and claims that she was discriminated against due to her "gender (the male employees were treated more favorably), age (I was the oldest employee and the younger employees were treated more favorably), National Origin (I am from the North and had many comments about me being a Yankee), Religion (I am Jewish) and suffered from a Hostile Work Environment and Retaliation" [*Id.* (emphases and underlines omitted)]. Plaintiff also noted that she reported violations of company policies or "illegal activities" [*Id.*]. Plaintiff followed this letter with a formal charge of discrimination on April 12, 2012 [Doc. 29-24]. In the narrative section of her charge of discrimination, plaintiff notes that Ms. Dixon harassed and treated plaintiff differently than younger employees, would give younger servers plaintiff's tables to serve, and would also treat plaintiff differently than the male employees [*Id.*]. Plaintiff also notes that she was "constantly called a Yankee because I am from the north and Jewish" [*Id.*]. In addition to claiming she has been discriminated against and retaliated against due to her age, gender, and religion, plaintiff notes she was discriminated on the basis of her "national origin (Accent)" [*Id.*]. The EEOC issued its right to sue letter on October 30, 2012, which appears to have included plaintiff's original February 2012 letter [Doc. 11-1].

Plaintiff filed her original complaint [Doc. 1] on December 19, 2012, alleging claims of sex, gender, religious, and national origin discrimination, as well as harassment/hostile work environment, retaliation, and various state claims. The

9

complaint alleges that plaintiff's national origin discrimination was based on the fact that she was "Northern" [*Id.* ¶ 5]. In response to a motion to dismiss filed by defendant [Doc. 4], plaintiff filed an amended complaint [Doc. 11] in which she substituted her Hungarian and Czechoslovakian heritage for purposes of her claim of national origin discrimination [*see id.* ¶ 4], as well as additional allegations.

## II.    Standard of Review

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986); *Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 339 (6th Cir. 1993). All facts and all inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 301 F.3d 937, 942 (6th Cir. 2002).

"Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations." *Curtis Through Curtis v. Universal Match Corp.*, 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991) (citing *Celotex*, 477 U.S. at 317). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*,

10

477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Anderson*, 477 U.S. at 250. The Court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## III. Analysis

### A. Disparate Treatment

Title VII and the ADEA make it illegal for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" due to an individual's religion, sex, national origin, or age. 42 U.S.C. § 2000e-2(a)(1); 29 U.S.C. § 623(a). A plaintiff may establish a claim under Title VII or the ADEA by offering either direct or circumstantial evidence of discrimination. *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 363 (6th Cir. 2010); *see also Grubb v. YSK Corp.*, 401 F. App'x 104, 113 (6th

11

Cir. 2010) (citing *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (en banc)). Direct evidence is "that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009) (citing *Wexler*, 317 F.3d at 570 (internal quotation marks omitted)); *see also Kuhn*, 709 F.3d at 624. In other words, direct evidence proves the occurrence of discrimination without requiring further inferences. *Reeves v. Swift Transp. Co.*, 446 F.3d 637, 640 (6th Cir. 2006). "Statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself [cannot] suffice to satisfy the plaintiff's burden . . . of demonstrating animus." *Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998) (alteration in original) (internal quotation marks omitted). Similarly, "[i]solated and ambiguous comments are insufficient to support a finding of direct discrimination." *White v. Columbus Metro. Housing Auth.*, 429 F.3d 232, 239 (6th Cir. 2005). Circumstantial evidence, on the other hand, "is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Geiger*, 579 F.3d at 620. With respect to her ADEA claim, whether a plaintiff relies on direct or circumstantial evidence, the burden of persuasion remains on the plaintiff to demonstrate by a preponderance of the evidence that age was the 'but-for' cause of the challenged adverse employment action. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009); *see, e.g. Harris v. Metro. Gov't of Nashville & Davidson Cnty.*, 594 F.3d 476, 485 (6th Cir. 2010). "The ultimate question in every employment

12

discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Geiger*, 579 F.3d at 620.

Discrimination claims based on circumstantial evidence are analyzed under the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410-11 (6th Cir. 2008). Under the *McDonnell Douglas* framework, the burden is on the plaintiff to first establish a prima facie case under the relevant statute. 411 U.S. at 802. A plaintiff establishes a prima facie case of disparate treatment by showing, *inter alia*, that (1) the plaintiff was a member of a protected class; (2) the plaintiff suffered an adverse employment action; (3) the plaintiff was qualified for the position; and (4) the plaintiff was replaced by someone outside the protected class or was treated differently than similarly situated employees outside the protected class. *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992). After a prima facie case has been established, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997). "Once the defendant meets this burden, 'the plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation'" as mere pretext. *Martin*, 548 F.3d at 410-11 (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994)).

In this case, the parties do not dispute that plaintiff was a member of several protected classes, and agree that plaintiff was qualified. Where the parties disagree,

however, is as to what actions may be considered in the Court's analysis, as well as to whether plaintiff was treated differently than a similarly situated employee, and whether defendant had a non-pretextual reason for her termination. Plaintiff, who devotes the majority of her brief to highlighting points which she believes show there are genuine issues of material fact, argues that summary judgment is improper as to her disparate treatment claims.

Initially, the Court notes that there is no evidence to support a finding of direct discrimination. Although plaintiff's complaint and brief set forth various comments related to her age, as well as occasional comments based on her religion and national origin, there has been no evidence that these comments were anything more than "isolated remarks" or that these comments were proximate in time or otherwise related to the challenged actions and the decision-making process. *Blandford v. Exxon Mobil Corp.*, 483 F. App'x 153, 158 (6th Cir. 2012).

### 1. Adverse Action

Turning to the *McDonnell Douglas* framework for analyzing circumstantial evidence, defendant first argues that several of the adverse actions which plaintiff alleges are procedurally barred, including her claim that Ms. Dixon instructed a hostess not to give plaintiff tables, as evidenced by plaintiff's September 2009 letter to management [Doc. 29-15]. Defendant submits that any claim as to this incident is barred by the 300-day statute of limitations for the filing of an EEOC charge and that there is no evidence

14

of a continuing violation. Plaintiff submits that she has complied with the statute of limitations.

The timely filing of a charge with the EEOC is a prerequisite to filing suit under Title VII. A plaintiff claiming a discrete act of discrimination or retaliation in violation of Title VII, who initially instituted proceedings with a state or local agency with authority to grant or seek relief from such practice, has 300 days after the alleged unlawful employment practice occurred to file a claim. 42 U.S.C. § 2000e-5(e)(1); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002); *Nichols v. Muskingham College*, 318 F.3d 674, 679-80 (6th Cir. 2003). A plaintiff may not recover for discrete acts of discrimination or retaliation that occur more than 300 days before a charge is filed with the EEOC. *Morgan*, 536 U.S. at 110, 113. Where, however, there is an "'ongoing, continuous series of discriminatory acts, they may be challenged in their entirety as long as one of those discriminatory acts falls within the limitations period.'" *Weigel v. Baptist Hosp. of East Tenn.*, 302 F.3d 367, 376 (6th Cir. 2002) (quoting *Haithcock v. Frank*, 958 F.2d 671, 677 (6th Cir. 1992)). "'To establish a continuing violation, plaintiff must first produce evidence of a current violation taking place within the limitations period. Second, plaintiff must show that the current violation . . . is indicative of a pattern of similar discriminatory acts continuing from the period prior to the limitations period.'" *Id.* (quoting *Gallagher v. Croghan Colonial Bank*, 89 F.3d 275, 278 (6th Cir. 1996)).

Plaintiff's September 21, 2009 email claims that one night during her shift it appeared that her section of tables was empty and that "[t]he hostess came up to

15

[plaintiff] and apologized and said that [Ms. Dixon] told her not to go to [plaintiff's] tables with parties, she had to go to other tables" [Doc. 29-15 at 2]. Assuming that denying plaintiff tables to serve constitutes an adverse action, the Court finds that this incident is time barred, as it occurred more than 300 days before plaintiff filed her EEOC charge in April 2012, nor is their evidence that this was a constant activity.[1] In her January 7, 2012 email, plaintiff discusses an instance where she was skipped in the rotation of serving tables, and notes that this was an "ongoing problem" which had occurred since she told the hostess not to sit her [Doc. 29-18 at 3]. The Court finds this passing reference to the September 2009 incident is not evidence of "a pattern of discriminatory acts" relating back to the September 2009 incident, *Weigel*, 302 F.3d at 376 (quotations omitted) nor is the fact that plaintiff may have been skipped in rotation sufficiently related to Ms. Dixon actively informing staff not to give plaintiff tables. In addition, the Court notes that there is no evidence of plaintiff making complaints between 2010 and 2012 pertaining to Ms. Dixon telling host staff not to give plaintiff tables, given that her last letter before January 2012 was written in May 2010. Accordingly, to the extent plaintiff claims that Ms. Dixon's refusal to give plaintiff tables constitutes an adverse action, the Court finds that such conduct is time-barred for the purposes of her disparate treatment claim.

---

[1] The Court also notes that, even if this evidence were not time-barred, it would be inadmissible hearsay which cannot be relied upon to create genuine issue of material fact, given that plaintiff's letter is reporting what a co-worker told her about what Ms. Dixon had said. *See* Fed. R. Evid. 802; Fed. R. Civ. P. 56(c)(2).

16

Defendant next argues that, to the extent plaintiff claims she suffered disparate treatment when Mr. Smith chose another employee to train new servers in the summer of 2011, this claim would be barred because plaintiff did not allege this type of adverse action in her EEOC charge and thus has failed to exhaust her administrative remedies. Plaintiff did not address this argument in her response to plaintiff's motion. *See* E.D. Tenn. L.R. 7.2 (failure to respond to a motion may be deemed a waiver of any opposition to the relief sought)); *see, e.g. Taylor v. Unumprovident Corp.*, No. 1:03-CV-1009, 2005 WL 3448052, *2 (E.D. Tenn. Dec. 14, 2005) (noting that a responding party waives opposition to an opponent's argument when it fails to respond to that argument). Accordingly, the Court finds that plaintiff may not use this 2011 incident as evidence of an adverse action.[2]

In addition to her termination, plaintiff references various events during the course of her employment which she argues constitute adverse employment action, from not always getting busy sections, being denied large tables to serve, and not always being given tables in order, to not being allowed to talk on her cell phone or stand at the host stand as younger servers were. To establish a claim of discrimination, a plaintiff must show that she has "suffered a 'materially adverse' change in the terms or conditions of employment because of the employer's action." *Nguyen v. City of Cleveland*, 229 F.3d

---

[2] In addition to being excluded from plaintiff's EEOC charge, the person who was chosen to train new employees was another female over 40 years of age [Doc. 29-6 at 165:18-20, 178:10], and plaintiff has not presented any evidence to indicate this person was of a different religion or different national origin, so that plaintiff would likely have been unable to prove a prima facie case of discrimination.

17

559, 562 (6th Cir. 2000). "A 'mere inconvenience or an alteration of job responsibilities' or a 'bruised ego' is not enough to constitute an adverse employment action." *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 797 (6th Cir. 2004) (quoting *Kocsis v. Multi-Care Mgmt. Inc.*, 97 F.3d 876, 886 (6th Cir. 1996)). In *Kocsis*, the Sixth Circuit, echoing other courts, listed various factors to consider in which an employment action was materially adverse, including: "'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.'" *Kocsis*, 97 F.3d at 886 (quoting *Crady v. Liberty Nat'l Bank & Trust, Co.*, 993 F.2d 132, 136 (7th Cir. 1993)).

Upon review of the many actions contained within plaintiff's complaint and brief, the Court finds that her 2012 termination is the only event that constitutes an adverse employment action that is not otherwise procedurally barred. During the course of her depositions, plaintiff stated during discovery that she was not always assigned a bad section of the restaurant, that she rotated through the restaurant like the other servers, that she had "good tables" and "bad tables," as well as good and bad sections, and that she sometimes, but not always, worked "banquets" [Doc. 29-6 at 166:17-167:16]. Although plaintiff could not remember whether she was a "shift leader" in 2011, plaintiff testified that she had served as a shift leader once or twice a month from 2008-2012. As evidenced by plaintiff's statements, then, the majority of plaintiff's complaints in this regard are examples of mere inconveniences or slight alterations of responsibilities which

defendant has submitted are common practice at defendant's restaurant [*See* Doc. 29-1 at 21-23]. Although plaintiff references the fact that she may have lost money on these occasions, plaintiff's statements and defendant's evidence both indicate that a server's earnings would vary from shift to shift. Plaintiff has not presented evidence that these discrepancies were related to discrimination rather than the nature of her employment. While plaintiff argues that she was not permitted to use her cellular phone, stand at the host stand, or other activities when Ms. Dixon was working, plaintiff has not argued or presented evidence showing that any of these actions constitute a material loss of benefits. Accordingly, the Court finds that plaintiff's termination is the only adverse action for the purposes of her disparate treatment claim.

### 2. Defendant's Proffered Reason and Pretext

Assuming plaintiff could establish her prima facie case of discrimination regarding her termination, the Court concludes that defendant is nonetheless entitled to summary judgment on plaintiff's disparate treatment claim because it has proffered a legitimate, non-discriminatory reason for her termination and plaintiff has failed to create a genuine issue of material fact as to pretext. *See Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 502 (6th Cir. 2009) (noting that court need not address prima facie issue where plaintiff fails to establish pretext). Defendant has argued that plaintiff's inability to get along with her co-workers and supervisors was the basis for her termination, as evidenced by the recordings in the Manager's Log, the altercation that occurred on January 7, 2012, as well as the deposition testimony of Mr. Smith. Mr. Smith testified that he had previously

19

spoken with plaintiff about getting along better with her co-workers, about how her behavior was affecting other co-workers' performance, and that her behavior could lead to her termination [Doc. 29-8 at 35:7-16]. *See Viergutz v. Lucent Techs., Inc.*, 375 F. App'x 482, 484 (6th Cir. 2010) (holding that employee's poor reputation for getting along with others was legitimate reason for not hiring employee); *see, e.g. McShane v. U.S. Attorney Gen.*, 686 F.3d 779, 792 (11th Cir. 2005) (holding that not getting along well with others was a legitimate, non-discriminatory reason for termination). Because defendant has proffered a non-discriminatory reason for her termination, the burden shifts to plaintiff to produce evidence of pretext. *See Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. 2012).

"[A] plaintiff can establish pretext by showing '(1) that the proffered reasons had no basis *in fact,* (2) that the proffered reasons did not *actually* motivate his [discipline], or (3) that they were *insufficient* to motivate discharge.'" *Id.* (quoting *Manzer*, 29 F.3d at 1084). "The third category of pretext consists of evidence that other employees, particularly employees outside the protected class, were not disciplined even though they engaged in substantially identical conduct to that which the employer contends motivated its discipline of the plaintiff." *Id.* (citation omitted). In examining pretext, it is not required that "the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998).

20

In this case, plaintiff has presented no evidence that would create a genuine issue of material fact as to whether defendant, particularly Mr. Smith, actually believed that defendant did not get along well with others and that this caused a disruption in the restaurant, based on the statements of plaintiff's co-server who heard defendant arguing in front of customers on January 7, 2012, as well as the entries in the Manager's Log. *See id.* ("[I]n order for an employer's proffered non-discriminatory basis for its employment action to be considered honestly held, the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made.").  Although plaintiff submits that she does not agree with the entries in the Manager's Log, she has submitted no "proof to the contrary." *Id.*  As to the third form of pretext, plaintiff has submitted a table of employee conduct which she claims took place during the course of her employment and for which employees were not terminated, through which she argues that plaintiff's failure to get along with others was insufficient to justify her termination [*See* Doc. 37-1 at 12-13].  In doing so, however, plaintiff does not identify another similarly situated employee who engaged in "substantially identical conduct" resulting in her termination.  *Chattman*, 686 F.3d at 349. To the extent plaintiff points to Mr. Gibson's treatment as evidence of pretext, as he was not terminated after the January 7, 2012 incident, defendant submitted evidence showing that Mr. Gibson had not been employed as long as plaintiff, did not have as strong a reputation for not getting along with others, and was eventually terminated for disrupting the work environment, so that the two are not similarly situated [Docs. 29-5 at ¶ 15; 29-8

21

at 42:1-43:6]. Accordingly, the Court finds that plaintiff has not created a genuine issue of material fact as to pretext, and defendant is entitled to summary judgment on plaintiff's disparate treatment claim.

## B. Hostile Work Environment

Defendant also argues that plaintiff has presented no evidence showing that she was subject to a hostile working environment based on her religion, national origin, gender, or age. It is well settled that Title VII protects employees from a "workplace permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 514 (6th Cir. 2009) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). To prove a hostile work environment claim based on harassment by a coworker, a plaintiff must establish that: (1) she was a member of the protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her protected characteristic; (4) the harassment had the effect of unreasonably interfering with her work performance and created an objectively intimidating, hostile, or offensive work environment; and (5) the employer knew or should have known of the alleged harassment and failed to implement prompt and appropriate corrective action. *See Blankenship v. Parke Care Ctrs., Inc.*, 123 F.3d 868, 872 (6th Cir. 1997); *see also Bourini v. Bridgestone/Firestone North Am. Tire, LLC*, 136 F. App'x 747, 750 (6th Cir. 2005) (applying *McDonnell Douglas* framework to claim of religious discrimination); *Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 834-35

22

(6th Cir. 1996) (analyzing hostile work environment claim in context of the ADEA). This standard is "markedly different" from the one applied to harassment by supervisors. *Blankenship*, 123 F.3d at 873. Under this standard, "the employer can be liable only if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known." *Id*.

With regard to the fourth element, the plaintiff must show that the conduct was "severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000). Alternatively stated, the plaintiff must show that the environment was both objectively and subjectively hostile; that is, the conduct was severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim subjectively regarded the environment as abusive. *Thornton v. Fed. Express Corp.*, 530 F.3d 451, 455 (6th Cir. 2008). In order to evaluate this element, the court must consider all of the circumstances, including the frequency of the discriminatory conduct; the severity of the conduct; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance. *Id*. The conduct complained of "must be extreme to amount to a change in the terms and conditions of employment," *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998), and "simple teasing . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions

23

of employment." *Id.* (quotations omitted). A work environment viewed in its totality may satisfy the standard of an abusive work environment, even if no single episode rises to the level of a hostile work environment. *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 564 (6th Cir. 1999).

### 1.    Religion and National Origin

Turning first to plaintiff's arguments that a hostile work environment existed because of her religion and/or national origin, the only statements or comments plaintiff attributes to her religion are the 2010 interactions she had with co-workers who invited her to attend church or church activities with them and Ms. Dixon's April 2011 comment that she did not like Jewish people and act of calling plaintiff a "stupid Jew." Defendant argues that these comments are time-barred and are not part of any continuous activity.[3] In addition, defendant argues that there has been no evidence that the comments were pervasive or severe enough so as to contribute to a hostile work environment.

As previously discussed, absent evidence of a continuing violation, plaintiff's claims pre-dating June 17, 2011 are time barred. Plaintiff does not dispute that there were no disparaging remarks made as to plaintiff's religion after this date. To the extent plaintiff attempts to argue that the other actions taken by Dixon, *i.e.* allowing other servers to sit at the restaurant bar and watch television, helping servers with their duties, and the like, are evidence of an "ongoing continuous series of discriminatory acts," these

---

[3] Although the Court views the evidence in a light most favorable to the plaintiff, defendant notes that Ms. Dixon denies ever making this comment, and that none of defendant's other employees recall hearing this comment [Doc. 30 at 11 n.20].

24

actions, which plaintiff alleges occurred within the limitations period, do not evidence a "continuing violation" which would permit consideration of the time-barred comments. *Id.* at 376. In particular, the Court notes that plaintiff has not shown these acts to be "sufficiently similar or related to the time-barred acts," *id.* at 377, given that there has been no evidence presented that servers were treated differently on the basis of religion, nor any evidence that these episodes were pervasive or severe. Thus, the Court finds that there was no "act contributing to [plaintiff's religion-based claim] within the filing period . . . ." *Morgan*, 536 U.S. at 117. Even if these comments could be considered in determining whether a hostile work environment existed, the Court notes that, at most, these remarks are isolated and do not rise to the requisite level of severity, under the relevant case law, to support plaintiff's claim. *See Hussein v. Highgate Hotels* 126 F. App'x 256, 268-69 (6th Cir. 2005) (noting that offhand comments and isolated remarks regarding employee's ethnicity could not create a hostile work environment).

The Court reaches a similar conclusion with regard to plaintiff's hostile work environment claim based on her national origin, that is, her Hungarian and Czechoslovakian descent. In this regard, plaintiff submits that she was often called a "Yankee" or "damn Yankee" by her co-workers, including Mr. Smith, which occurred from 2009-2012. Similarly, plaintiff points to the fact that she was asked to say certain words because of her accent, that she was referred to as "New York," and that several co-workers claimed she was in the mafia, as evidence of harassment. Initially, the Court notes that plaintiff has submitted no evidence that these comments bear any connection to

her Hungarian/Czechoslovakian descent, so that these comments could be said to have been made "based on" her national origin. *Blankenship*, 123 F.3d at 872. In fact, there is no evidence that any of plaintiff's co-workers were aware of or knew about plaintiff's heritage, other than plaintiff's statements during depositions that she had told Ms. Dixon of her Czechoslovakian and Hungarian descent, further diminishing the possibility that these comments were based on her ethnic background. It appears that these comments, and plaintiff's reliance upon them to sustain her claim, would be more relevant in relation to plaintiff's original claim that she was discriminated against because she was "Northern," as she is originally from New York [*See* Doc. 1 ¶ 5], rather than to the claim presently before the Court.[4] Similarly, the Court notes that plaintiff has not presented any evidence to create a triable issue of fact that, to the extent her accent was the source of disparaging remarks, any accent was connected to her Czechoslovakian or Hungarian background. *Cf. Berke v. Ohio Dep't of Pub. Welfare*, 628 F.2d 980, 981 (6th Cir. 1980) (affirming finding of discrimination where plaintiff, who was born in Poland and emigrated to the United States, had shown she was denied two positions based on her accent, "which flowed from her national origin").

As to the fourth factor, in considering the severity or pervasiveness of these comments, even when resolving all inferences in her favor, plaintiff has failed to create

---

[4] The Court notes, however, that, to the extent plaintiff's response attempts to revive her claim that she was discriminated against because she was from New York, this claim would be insufficient under Title VII's provisions protecting against discrimination on the basis of national origin. *See Espinoza v. Farah Mfg. Co., Inc.*, 414 U.S. 86, 88 (1973) (noting generally that national origin "refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came").

an issue of triable fact as to whether a reasonable person would find these comments offensive to someone of Hungarian or Czechoslovakian descent, given that there has been no evidence connecting these remarks with her heritage. Nor has plaintiff argued or presented sufficient evidence that any of these comments interfered with her ability to perform her job duties. *Crawford*, 96 F.3d at 835.[5]

Because she cannot show that the comments regarding her religion or national origin created an objectively hostile work environment, summary judgment will be granted as to plaintiff's hostile work environment claims based on religion or national origin.

## 2. Age

Plaintiff also argues that she was subject to a hostile work environment because of her age. In support of her position, plaintiff submits that between 2011 up through her termination in 2012 Mr. Smith referred to plaintiff as "old lady," and that on other occasions various co-workers made comments stating plaintiff was too old for the job, was too old for the restaurant business, or that she could not keep up with the younger servers. In addition, plaintiff contends that Ms. Dixon would hang out with the younger workers but would never talk to plaintiff, that she would give younger servers preferred tables, let them stay late, and let them leave to purchase beer and cigarettes. In other

---

[5] In addition, the Court finds that, even viewing these comments in light of the other alleged conditions of employment, that is, receiving less favorable treatment than her co-workers, plaintiff has not shown a factual question as to whether she was harassed because of her national origin under the "totality of the circumstances" because she has not presented evidence that any such treatment was based on her protected characteristic. *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 564 (6th Cir. 1999).

words, plaintiff submits, Ms. Dixon would let younger servers "get away with a lot of stuff" [Doc. 37-1 at 29]. Defendant submits that plaintiff cannot show that any such conduct or comments were severe or pervasive enough to present a triable question of fact, and cannot show that defendant itself had reason to know of any such comments.

Upon review of the evidence of record related to plaintiff's claim of age-based harassment, the Court concludes that plaintiff has not created a genuine issue of fact as to her age-based hostile environment claim. Turning first to the comments made by plaintiff's co-workers, plaintiff has not argued that such remarks were anything beyond the occasional offhand comment that is not prohibited under the ADEA, as they constitute "mere offensive utterances" as opposed to physically threatening or humiliating conduct or remarks. *See Crawford*, 96 F.3d at 836 (finding that comments, such as "'old people should be seen and not hard,'" was not enough to create a hostile working environment). These remarks are insufficient, under the case law, to meet the objective requirement of offensiveness. Similarly, as to the comments made by Mr. Smith, as plaintiff's supervisor, plaintiff has not presented evidence indicating that any such comments gave rise to an objectively hostile work environment.

Instead, analyzing plaintiff's claims of age-related comments in conjunction with plaintiff's claims about the mistreatment and other comments she suffered at the hands of

Ms. Dixon and others,[6] the Court finds plaintiff's circumstances and arguments are similar to the plaintiff in *Crawford*. In that case, the plaintiff had been employed at a hospital for several years when a new supervisor was hired, after which the plaintiff began to complain about the work environment, particularly the actions and comments of her new supervisor. *Id.* at 832. The plaintiff based her allegations of a hostile work environment on various comments about age, some of which were made in her presence, some of which she had heard from co-workers, and also argued that the office was divided between those who were older and those who were younger. *Id.* The plaintiff also argued that the older workers were not included in anything, whether it be office parties or changes to office policy. *Id.* at 833. In addition, there was evidence that the plaintiff was also known to argue with other, younger co-workers. In affirming the district court's grant of summary judgment, the Sixth Circuit noted:

> Unquestionably, there was hostility and abusiveness in this working environment, but the evidence suggests that the atmosphere stemmed from a simple clash of personalities. In any event, there is an absence of evidence that it stemmed from a dislike of people over a particular age. Indeed, many of the comments that [plaintiff] asserts were age-based were, in reality, neutral . . . it is [plaintiff] who simply assumes, without objectively articulable support, that when she was insulted with age-neutral insults, it was *because of* her age.
>
> Along those same lines, we think it is patent that we must entirely discount the plaintiff's complaints insofar as they focus on coworkers having parties without inviting her, or coworkers being surly or impolite. Even if coworkers failed to invite her to parties *because* she was over 55, it seems

---

[6] For example, in her response plaintiff notes that Ms. Dixon would comment to other employees that she did not like plaintiff, that she hated the plaintiff, and that she "couldn't stand her guts" [Doc. 37-11 at 173], and that on one occasion, a younger server cursed at plaintiff [Doc. 37-1 at 7].

obvious that the ADEA was not intended to remedy minor social slights and the resulting hurt feelings.

*Id.* at 836; *see also* 250 F. App'x 120, 129 (6th Cir. 2007) (finding that incidents of laughing and teasing handicapped individual did not satisfy the standard for a hostile work environment under Michigan law, which mirrored Title VII, "because they evidence[d] mere personal dislike and constitute[d] mere teasing that [did] not establish an actionable hostile work environment").

In this case, the evidence presented shows that plaintiff and Ms. Dixon did not get along, and that plaintiff did not always get along well with all of her co-workers.[7] As a result, Ms. Dixon may have interacted more with plaintiff's co-workers, the majority of whom were younger. Ms. Dixon may have been more willing to help them during the course of a shift than she was willing to help plaintiff. Ms. Dixon may have talked about plaintiff and expressed her dislike about her to co-workers.[8] Plaintiff, however, has not presented any evidence that the basis for this differential treatment was age, rather than personal animosity. In addition, while plaintiff cites to numerous examples in which Ms. Dixon permitted younger co-workers to engage in conduct that may have violated

---

[7] Although plaintiff submitted an affidavit in response to plaintiff's motion that she was not "difficult to work with" and she "got along with her co-workers," the Court notes numerous references in her deposition testimony where she noted disputes with her co-workers, in addition to the records contained in the Manager's Log. *See United States ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296, 303 (6th Cir. 1998) ("[A] party cannot avoid summary judgment through the introduction of self-serving affidavits that contradict prior sworn testimony.").

[8] The Court notes, however, as defendant argues, that the majority of the statements plaintiff claims are attributable to Ms. Dixon may not defeat summary judgment as they are based on inadmissible hearsay from co-workers. *See* Fed. R. Civ. P. 56(c)(2) (noting that party could object to material that cannot be presented a form that would be admissible in evidence).

30

company policy, plaintiff has not argued that she attempted to engage in the same conduct, or, as previously discussed, that age was the basis for the disparity. Similarly, plaintiff has not shown that the actions she has complained of from other co-workers, *i.e.* curse words, serving tables that were meant to be serviced by plaintiff, or similar actions, bore any connection to her age. Given the Supreme Court's caution against turning employment discrimination laws into a "general civility code," *Faragher*, 524 U.S. at 788, the Court finds that summary judgment is proper as to plaintiff's hostile work environment claim as it relates to her age without discussing whether defendant knew of the conduct or had an obligation to take corrective action.[9]

Accordingly, considering plaintiff's allegations with respect to each protected class of which she was a member individually and under the totality of the circumstances, the Court finds that defendant is entitled to summary judgment on plaintiff's hostile work environment claim.

### C.   Retaliation

Defendant also moves for summary judgment as to plaintiff's claims of retaliation. Specifically, defendant argues that there is no genuine issue of material fact as to whether plaintiff engaged in protected activity under Title VII or the ADEA, as the letters and emails do not complain of any harassment based on a protected characteristic. Defendant

---

[9] The Court reaches the same conclusion with regard to plaintiff's claim of a hostile work environment based on her sex. In her response to defendant's motion, plaintiff offers no offensive remarks or other comments to support a claim of a hostile work environment, nor presents any separate argument pertaining to this claim. To the extent that plaintiff argues that she was subjected to less preferential treatment because of her gender, the Court applies the same analysis as previously discussed and finds that plaintiff has not shown that her gender was the basis for any of Ms. Dixon's or other co-workers' conduct.

also argues that there is no evidence of a causal connection. Plaintiff argues that she can establish a causal connection given the close proximity between her final emails regarding Ms. Dixon and her termination. In addition, plaintiff argues that Dixon's actions of subjecting her to severe and pervasive harassment after her reports constitute sufficient evidence to defeat summary judgment.

Both Title VII and the ADEA prohibit retaliation against an employee who has opposed an unlawful employment practice or "has made a charge, testified, assisted or participated in any manner" in an investigation, proceeding, hearing or litigation. 42 U.S.C. § 2000e-3(a); 29 U.S.C. § 623(d). To establish a prima facie case of retaliation, plaintiff must prove that: (1) she engaged in an activity protected by Title VII or the ADEA; (2) her exercise of protected rights was known to defendant; (3) defendant thereafter took an adverse employment action against her, or she was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment. *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 288 (6th Cir. 2012); *Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000). "A plaintiff asserting such a claim must prove that she took an overt stand against suspected illegal discriminatory action to establish that she engaged in a protected activity." *Blizzard*, 698 F.3d at 288. "An employee 'may not invoke the protections of the Act by making a vague charge of discrimination.'" *Id.* (quoting *Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 591 (6th Cir. 2007)).

"Courts analyzing retaliation claims apply the *McDonnell Douglas/Burdine* framework of shifting burdens of production and proof." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007) (citation omitted). "To establish a causal connection, a plaintiff must proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Dixon*, 481 F.3d at 333 (internal quotation marks and citations omitted).

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

*Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) (finding plaintiff met prima facie case where plaintiff was fired on same day employer learned of EEOC charge). Should a plaintiff succeed in making out a prima facie case, "the burden of production of evidence shifts to the employer to articulate some legitimate, nondiscriminatory reason for its actions." *Morris*, 201 F.3d at 792-93 (internal quotation marks and citation omitted). If defendant successfully produces such a legitimate reason, then the burden of production returns to the plaintiff to demonstrate by a preponderance of the evidence that the proffered reason was a mere pretext for discrimination. *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 675 (6th Cir. 2013).

In this case, the only correspondence which could qualify as engaging in a protected activity is in her September 2009 letter to a corporate officer of defendant [Doc.

33

29-15].  In the letter, plaintiff writes that '[t]here have been several instances where [Ms. Dixon] has scolded female employees for the littlest things, and praised the male servers for incompetence" [*Id.* at 3].  The Court finds that reporting that male employees were being treated differently than female co-workers could qualify as protected activity, viewing the evidence in a light most favorable to plaintiff.  *See Blizzard*, 698 F.3d at 288-89 (finding that oral complaints of being treated differently than younger employees could qualify as protected activity); *see, e.g. McKinley v. Skyline Chili, Inc.*, 534 F. App'x 461, 467 (6th Cir. 2013) (citing to *Blizzard* and finding that plaintiff's statements that younger and male counterparts were not being held as accountable as she was could constitute protected activity).  The Court finds, however, that to the extent plaintiff relies upon her termination as an "adverse employment action," plaintiff failed to present any evidence of a causal connection, the fourth element for a retaliation claim, particularly in light of the fact that she was not terminated until January 2012, more than two years after the email was sent.  To the extent that plaintiff argues that Ms. Dixon's treatment of plaintiff was "retaliatory harassment" by a supervisor, the Court finds this argument insufficient as well.  As previously discussed, plaintiff has presented no evidence that Ms. Dixon's  treatment of  the plaintiff was severe or  pervasive so as to constitute the type of

harassment barred by Title VII or the ADEA, nor is there evidence of a causal connection to support this variation of plaintiff's claim.[10]

With regard to the remaining letters and emails plaintiff sent to managers, the Court finds that none of these communications can be said to constitute an "overt stand against suspected illegal discriminatory action" so as to be protected activity within the meaning of the statutes. *Blizzard*, 698 F.3d at 288. Although plaintiff occasionally references the terms "discrimination" and "hostile environment," neither of these terms are associated with any allegations that Ms. Dixon or another employee was discriminating on the basis of gender, age, religion, or national origin. At most, these communications indicate plaintiff's disagreement with Ms. Dixon's leadership, plaintiff's reports of co-workers' conduct, or her general feelings of Ms. Dixon, evidencing their personal animosity with one another rather than illegal discrimination. *See Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1313-14 (6th Cir. 1989) (finding that letter questioning the correctness of a decision made by employer, disputing employer's position with regard to plaintiff's conduct, and vague charge of "ethnocism" insufficient to constitute protected activity); *see also Manstra v. Norfolk S. Corp.*, No.

---

[10] In addition, and as referenced by defendant in its brief, Ms. Dixon would not likely qualify as a "supervisor" for retaliatory harassment purposes in light of the Supreme Court's opinion in *Vance v. Ball State University*, 133 S.Ct. 2434 (2013), which held that an employer's vicarious liability for unlawful harassment "only when the employer has empowered that employee to take tangible employment actions against the victim, *i.e.,* to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits," *id.* There has been no evidence presented that Ms. Dixon was empowered to take any of these actions. The Court need not decide this issue, however, to determine that defendant is entitled to summary judgment on its retaliation claims.

3:10-CV-166, 2012 WL 1059950, at *11 (E.D. Tenn. Mar. 28, 2012) (finding that plaintiff's complaints about the "harsh" or "condescending" manner in which supervisor spoke to her and other complaints of unfair or harsh treatment did not constitute protected activity). Notably, in the letters preceding her January 10, 2012 termination, plaintiff does not employ the terms "harassment," "discrimination," nor discuss how she or any of her co-workers were being treated differently based upon some protected characteristic. Accordingly, the Court concludes that plaintiff has not created a genuine issue of material fact as to her claims of retaliation and summary judgment will be granted in defendant's favor.[11]

## D.    State Law Claims

Plaintiff alleges numerous violations of Tennessee statutory law as well as state tort claims. The Court's analysis of plaintiff's federal civil rights and Title VII claims, however, effectively disposes those claims of which this Court has original jurisdiction. While the Court has broad discretion under 28 U.S.C. § 1367(c)(3) to dismiss or to retain jurisdiction over pendent state law claims under these circumstances, "the usual course is for the district court to dismiss the state-law claims without prejudice if all federal claims are disposed of on summary judgment." *Thacker v. Lawrence Cnty.*, 182 F. App'x 464, 472 (6th Cir. 2006) (quoting *Brandenburg*, 253 F.3d 891, 900 (6th Cir. 2001)). *See, e.g.,*

---

[11] Even if plaintiff could prove a prima facie case of retaliation, the Court notes that defendant has proffered a legitimate reason for her termination, and, as previously discussed with respect to her disparate treatment claim, plaintiff has not created a genuine issue of material fact as to pretext. *See Chen v. Dow Chem. Co.*, 580 F.3d 394, 402 (6th Cir. 2009) (affirming summary judgment where plaintiff failed to show genuine issue of fact as to pretext).

*Jackson v. Town of Caryville, Tenn.*, Nos. 3:10-CV-153, 3:10-CV-240, 2011 WL 5143057, at *10 (E.D. Tenn. Oct. 28, 2011). Thus, pursuant to § 1367(c), in the exercise of its discretion and in the interests of comity, the Court will decline to exercise continuing "pendent" or supplemental jurisdiction over plaintiff's remaining state law claims. 28 U.S.C. § 1367(c); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725-26 (1966); *Brandenburg*, 253 F.3d at 900. As no compelling facts support this Court's continued jurisdiction of plaintiff's remaining state law claims, those will be dismissed.

## IV.    Conclusion

For the reasons stated herein, defendant's Motion for Summary Judgment [Doc. 29] will be **GRANTED** to the extent that the Court finds summary judgment in favor of defendant appropriate as to all of plaintiff's federal discrimination claims. Plaintiff's federal causes of action will be **dismissed with prejudice**, plaintiff's state causes of action will be **dismissed without prejudice**, and this case will be **closed**.

ORDER ACCORDINGLY.


s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE